## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HUNTINGTON LEARNING CENTERS, INC., | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | No. |
| | : | |
| v. | : | |
| | : | |
| BARBARA KEARNS-JONES and ATHENA EDUCATES, LLC | : | |
| | : | |
| Defendants. | : | |

### COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff Huntington Learning Centers, Inc. ("HLC"), by and through its attorneys, files this Complaint for Injunctive Relief and Damages against Defendants Barbara Kearns-Jones ("Kearns-Jones") and Athena Educates, LLC ("Athena," and collectively, "Defendants") and alleges:

### PARTIES

1.      Plaintiff Huntington Learning Centers, Inc. is a corporation organized and existing under the laws of Delaware with its principal place of business at 496 Kinderkamack Road, Oradell, New Jersey 07649.

2.      Upon information and belief, Defendant Athena Educates, LLC is a Pennsylvania limited liability company, organized and existing under the laws of the State of Pennsylvania, with its principal place of business located at 108 Hazel Street, Bentleyville, PA 15314.

3.      Upon information and belief, Defendant Barbara Kearns-Jones is an individual and an adult citizen of the State of Pennsylvania, residing at 108 Hazel Street, Bentleyville, PA 15314. Kearns-Jones is the sole owner and member of Athena and is a guarantor of the entity's obligations under the franchise agreement made with HLC.

## JURISDICTION AND VENUE

4.      Jurisdiction in this Court is founded upon 28 U.S.C. §§ 1331 & 1338 and the

Defend Trade Secrets Act of 2016, 18 U.S.C. § 1831, *et seq.*  The civil action hereinafter alleged

arises under the laws of the United States, including an Act of Congress relating to trade secrets.

All other claims herein alleged are so related to the claim under which this Court's original

jurisdiction is founded that they form part of the same case or controversy and are a proper exercise

of the Court's supplemental jurisdiction under 28 U.S.C. § 1367.

5.      The Court also has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332

because the parties to this action are diverse and the amount in controversy exceeds $75,000.00.

6.      Diversity among the parties is complete. HLC is a corporation organized and

existing under the laws of Delaware with its principal place of business in New Jersey.  Upon

information and belief, Kearns-Jones is an individual and an adult citizen of the State of

Pennsylvania, residing at 108 Hazel Street, Bentleyville, PA 15314.  Upon information and belief,

Kearns-Jones is the sole owner and member of Athena, which is a Pennsylvania limited liability

company, organized and existing under the laws of the State of Pennsylvania, with its principal

place of business located at 6563 Steubenville Pike, Pittsburgh, PA 15205.  Accordingly, diversity

of citizenship between Plaintiff HLC and Defendants is complete.

7.      In injunctive actions, it is settled that the amount in controversy is measured by the

value of the right sought to be protected by the equitable relief. *In re Corestates Tr. Fee Litig.*, 39

F.3d 61, 65 (3d Cir. 1994); *Barbuto v. Med. Shoppe Int'l, Inc.*, 166 F. Supp. 2d 341, 344 (W.D. Pa.

2001).  In other words, "it is the value to plaintiff to conduct his business or personal affairs free

from the activity sought to be enjoined that is the yardstick for measuring the amount in

controversy." *Id.* (citing 14A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure, § 3708 at 143–44 (2d ed. 1985)).

8.     The threat of Defendants' continuing violation of the non-compete agreement and post-termination obligations under the Franchise Agreement, and resultant damage to HLC's business, establishes the requisite amount in controversy. *See, e.g.*, *Barbuto v. Med. Shoppe Int'l, Inc.*, 166 F. Supp. 2d 341, 345 (W.D. Pa. 2001) (finding that prohibiting a franchisor from enforcing a non-compete provision met the amount in controversy threshold); *Soft Pretzel Franchise Sys. Inc. v. Taralli, Inc.*, 2013 WL 4774086, at *4 (E.D. Pa. Sept. 6, 2013) (finding that valuation of request for monetary damages for breach of franchise agreement, enforcement of Plaintiffs' right to purchase equipment, and injunction against defendants for the continued operation of the franchised business exceeded the amount in controversy); *see also Absolute Mach. Tools, Inc. v. Clancy Mach. Tools, Inc.*, 410 F. Supp. 2d 665, 668–69 (N.D. Ohio 2005) (finding that value of non-compete agreement, including value of plaintiff's lost revenue, met the amount-in-controversy requirement for federal diversity jurisdiction in an action for a preliminary injunction); *Info. Strategies, Inc. v. Dumosch*, 13 F. Supp. 3d 135, 142 (D.D.C. 2014) (same). Defendants generated business for HLC in excess of $75,000.00 for the period preceding the expiration of the Franchise Agreement.  Damage to HLC's business and HLC's lost revenue from Defendants' continuing violations exceeds the amount in controversy threshold.

9.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants operate the business that is the subject of this action in Allegheny County, Pennsylvania. Additionally, a substantial part of the events giving rise to this action occurred in Allegheny County, Pennsylvania.

## THE HUNTINGTON LEARNING CENTER FRANCHISE SYSTEM

10.     HLC is a franchisor of academic tutoring centers, with over two hundred franchised tutoring centers nationwide.   The franchisees provide services to customers that include test preparation, homework assistance, and other academic coaching.

11.     To identify the source, origin and sponsorship of Huntington Learning Center® Outlets and the services they offer, and to distinguish those Outlets and services from those established, offered and sold by others, HLC has extensively used certain trade names, service marks, trademarks, logos, emblems and indicia of origin, including but not limited to the name and mark Huntington Learning Center®, and other intellectual property (collectively "the Marks").

12.     HLC has continually provided its products and services under the Marks in interstate commerce in connection with the promotion, sale and franchising of Huntington Learning Center® Outlets and the promotion of the services they offer.

13.     HLC markets its products and services to its customers through a network of over two hundred locally owned and operated businesses in the United States.   These businesses operate pursuant to written franchise agreements, under which HLC grants franchises to qualified persons and entities the right to own and operate a Huntington Learning Center® Outlet using the Marks, but only in such manner and at such locations as are expressly authorized therein.

14.     The franchise agreements also license to the franchisees a distinct, uniform system (the "HLC System") consisting of confidential information, such as business processes, knowledge and technologies, and the right to use a unique business format and methods of operations relating to the establishment and operation of an academic tutoring services business.   Attendant to and an integral part of this license is the afore-alleged license to use the Marks.

15.     HLC and its franchisees use the HLC System as the trade identity by which the services offered by HLC and its franchisees are distinguished from other academic tutoring services businesses and the services provided by them.

16.     The HLC System is of inestimable value to HLC, representing and embodying HLC's considerable goodwill and favorable reputation amongst its customers.

17.     Maintenance of the highest standards of appearance, product quality and customer service is essential to the development and maintenance of the reputation and goodwill of HLC. Uniform service, appearance, products offered and overall experience by customers at all HLC locations is vital to developing and protecting HLC's goodwill and reputation.  These standards are critically important to HLC and to every HLC franchisee.

## THE FRANCHISE AGREEMENT

18.     On or about July 2, 2014, HLC entered into a written contract with the Defendants whereby HLC granted the Defendants the exclusive right to operate a HLC franchise in a defined area that included Robinson Township, Pennsylvania ("Exclusive Area").  Attached hereto as Exhibit A is a true and correct copy of the agreement between HLC and the Defendants ("the Franchise Agreement"), the terms of which are incorporated herein by reference.

19.     By written guaranty signed and delivered with the Franchise Agreement, Kearns-Jones guaranteed the obligations of the franchisee, Athena.  A copy of this written guaranty is appended to the Franchise Agreement attached as Exhibit A.

20.     The Franchise Agreement contained a three-year term and provided for unlimited renewal periods of 10 years each subject to certain conditions outlined in the Franchise Agreement. Exhibit A, § 3.1.

21.     Under Section 17.3 of the Franchise Agreement, the Defendants agreed that they shall not, for a period of for a period of two years following expiration or termination of the Franchise Agreement, directly or indirectly (1) operate a business that is the same as, or similar to, Defendants' former Huntington Learning Center franchised business, (2) offer tutoring in reading, phonics, study skills, mathematics, or related areas, (3) offer courses or tutoring in one or more academic subjects, or (4) offer educational services or products the same as or similar to those offered in Defendants' former Huntington Learning Center franchised business within 25 miles from the Exclusive Area in Robinson Township, Pennsylvania or within 25 miles of any business that is owned by HLC or any of HLC's affiliates or franchises. Exhibit A, § 17.3.3.

22.     Kearns-Jones signed a Confidentiality and Non-Competition Agreement, whereby she agreed "that while [she was] employed by [her] Employer and for a continuous uninterrupted period of two years beginning when [her] employment or affiliation with [her] Employer ends, [she] shall not in any way . . . own, maintain, operate, engage in, be employed by, be a consultant to, loan money to, provide any assistance to, be a franchisee of, or have any interest in . . . any business in competition with the Franchisor." A copy of this Confidentiality and Non-Competition Agreement is appended to the Franchise Agreement attached as Exhibit A.

23.     In Section 6.5 of the Franchise Agreement, the Defendants agreed, among other things, to pay HLC a monthly royalty equal to 9.5% of the preceding month's Gross Revenue from their franchise business in exchange for the continuing right to use the System and the Marks. In addition to the royalty, the Defendants agreed to pay HLC a training and technology fee of $550 per month after the second full calendar year of the Franchised Business operation.

24.     In Section 6.15 of the Franchise Agreement, the Defendants agreed, among other things, that if any payment due to HLC is not paid when due, then such payment shall be subject

to the then-current late fee and shall bear daily interest payable immediately upon demand at the rate of 18% per annum, but no more than the highest rate permitted by applicable law.

25.     In addition, Section 17.3 of the Franchise Agreement provides that upon such termination or expiration of the Agreement, Defendants would return to HLC all customer lists, customer records, correspondence, and all materials relating to the operation of the franchised business.

26.     Section 17.1 of the Franchise Agreement provides that Defendants will receive certain valuable information about HLC services, including development and operation of the HLC System, and that Defendants would not have been given the information without their execution of the Franchise Agreement and addenda.  Defendants acknowledged that the information has been developed by HLC over a number of years at great effort and expense and includes marketing techniques, operational procedures, business practices, and management methods not generally known, which will be of significant competitive advantage to Defendants, and all of which are trade secrets.  Defendants further agreed in Section 17.1 that it is reasonable to impose the non-competition provisions of the Franchise Agreement against Defendants.

27.     Pursuant to Section 24.9 of the Franchise Agreement, the prevailing party in any judicial action involving HLC and Defendants shall be entitled to recover its out-of-pocket costs and expenses, including all court costs and attorneys' fees, costs, and expenses.

**DEFENDANTS' UNLAWFUL ESTABLISHMENT OF A COMPETING BUSINESS**

28.     Upon information and belief, in or around March 2017, the Defendants established a business providing academic services to students.  That business was not authorized by HLC. The business was operated at 5992 Steubenville Pike, Pittsburgh, Pennsylvania, approximately

one mile from the location where Defendants operated their HLC franchise, at 6563 Steubenville Pike, Pittsburgh, Pennsylvania.

29.     The Defendants called their competing business "Open Minds Studio."  The Open Minds Studio website states that they provide the following services: reading, writing, and math skills; study and test taking skills; subject tutoring; ACT and SAT prep; and summer courses.

30.     Upon information and belief, Defendants used the HLC System as the model to structure the "Open Minds Studio."

31.     On June 20, 2017, HLC, by counsel, sent a notice of expiration of the Franchise Agreement to Defendants via overnight delivery service.  Attached hereto as <u>Exhibit B</u> is a true and correct copy of the termination letter dated June 20, 2017 (the "Termination Letter"), the terms of which are incorporated herein by reference.

32.     As set forth in the Termination Letter, the Defendants were reminded of their post-termination obligations and HLC demanded, among other things, immediate payment of past-due obligations and the immediate return of HLC's intellectual property, and the discontinuation of use of the Marks and other proprietary materials belonging to HLC.

33.     On June 30, 2017, HLC, by counsel, sent a cease-and-desist letter to Defendants via overnight delivery service.  Attached hereto as <u>Exhibit C</u> is a true and correct copy of the cease-and-desist letter dated June 30, 2017 ("the Cease-and-Desist Letter"), the terms of which are incorporated herein by reference.

34.     As set forth in the Cease-and-Desist Letter, the Defendants were reminded of their post-termination obligations and HLC demanded, among other things, immediate payment of past-due obligations and the discontinuation of Defendants' operation of a competing business within a radius of 25 miles from the former Exclusive Area and former franchised business.

35.     Despite receiving notice of the termination of the Franchise Agreement on or about June 21, 2017 and the Cease-and Desist Letter on or about July 1, 2017, and HLC's reminder of their post-termination obligations, the Defendants continue to provide competitive business services and products to HLC's customers.

36.     Upon information and belief, in providing services to HLCs customers, the Defendants have continued to use HLC's System, in violation of HLC's rights.  Specifically, the Defendants continue to provide services to customers that include test preparation, homework assistance, and other academic coaching at 5992 Steubenville Pike, Pittsburgh, Pennsylvania, approximately one mile from the location where the Defendants operated their HLC franchise.

37.     Also, despite their termination, the Defendants have not satisfied the post-termination obligations contained in the Franchise Agreement.

38.     In particular, Defendants have refused to cooperate in the orderly transfer of HLC's customers to HLC for continued servicing.

39.     In addition, the Defendants have not turned over any of the confidential and proprietary manuals, client and customer lists, software or other forms and proprietary materials maintained by the Defendants and belonging to HLC.

40.     Furthermore, the Defendants have failed and refused to pay all sums owing to HLC under the Franchise Agreement including royalties, training and technology fees, late fees, interest, attorneys' fees, and costs.

41.     Upon information and belief, the Defendants have also failed and refused to cease using the HLC System.

42.     The Defendants' use of the HLC System is without license or consent of HLC and has caused or is likely to cause mistake, confusion or deception in the minds of the public as to source, affiliation and sponsorship.

43.     Because HLC's franchisees and Defendants' competing business offer identical or nearly identical products and services, and the goods and services provided by the Defendants are offered to the same class of consumers as those who do business with authorized Huntington Learning Center® Outlets, customers will be deceived.

44.     Having received actual notice of their violations and infringement of the HLC System through the notice of termination and demands to cease and desist their illegal use of the HLC System, the Defendants' infringement is willful, malicious, fraudulent and deliberate.

## IRREPARABLE HARM

45.     Despite multiple requests, Defendants have refused to turn over HLC's customer lists, confidential information, and manuals, presumably due to Defendants' intended and/or ongoing solicitation of HLC's customers, in breach of Defendants' post-termination obligations.

46.     Defendants retention of client files has provided Defendants with an unfair opportunity to identify, solicit, and service HLC's customers.

47.     HLC's business is being seriously irreparably injured, and will continue to be irreparably injured, by Defendants' activities in the former franchised Exclusive Area in violation of HLC's contractual rights. *See ServiceMaster Residential/Commercial Servs. L.P. v. Westchester Cleaning Servs., Inc.,* No. 10-cv-02229, 2001 WL 396520, at *3 (S.D.N.Y. Apr. 19, 2001) ("There is a recognized danger that former franchisees will use the knowledge that they have gained from the franchisor to serve its former customers, and that continued operation under a different name may confuse customers and thereby damage the goodwill of the franchisor.").

48.     In the Confidentiality and Non-Competition Agreement appended to the Franchise Agreement, Kearns-Jones expressly acknowledged that a violation of the Confidentiality and Non-Competition Agreement will cause HLC irreparable harm, and therefore, HLC may apply for the issuance of an injunction preventing her from violating the Confidentiality and Non-Competition Agreement, in addition to any other remedies that HLC may have thereunder.

49.     Pursuant to Section 17.1 of the Franchise Agreement, Defendants acknowledged that they received certain valuable information about HLC services that has been developed by HLC over a number of years at great effort and expense.  Defendants acknowledged that HLC's marketing techniques, operational procedures, business practices, and management methods are trade secrets, which will be of significant competitive advantage to Defendants.  Defendants further agreed in Section 17.1 that it is reasonable to impose the non-competition provisions of the Franchise Agreement against Defendants.

50.     Pursuant to Section 16.1.5 of the Franchise Agreement, Defendants also agreed that failure to return HLC's manual, any of HLC's trade secrets, operating instructions, business practices, or any other proprietary information "will cause irreparable injury [to HLC], and [HLC] shall have the right to injunctive relief requiring [Defendants] to comply with the requirements of this Paragraph 16.1.5, in addition to any other remedies [HLC] may have under [the Franchise Agreement], at law or in equity[.]"

51.     When, "a party is in possession of another party's confidential information and is poised to use or disclose such information, there is a likelihood of irreparable harm."  *Jackson Hewitt, Inc. v. JSE Bus. Dev. Grp.*, 2009 WL 5205983, at *3 (D.N.J. Dec. 23, 2009) (citing *Nat'l Starch & Chem. Co. v. Parker,* 219 N.J. Super. 158, 162 (App. Div. 1987); *Ace Am. Ins. Co. v.*

*Wachovia Ins. Agency Inc.*, 306 Fed.Appx. 727, 732 (3d Cir. 2009) (noting that "disclosure of confidential information or trade secrets may constitute irreparable harm.")).

52.    A franchisor has a "protectable interest in the sale of a franchise because of expenditures made by a franchisor for market development and training, the grant of an exclusive sales area, and permission to use the franchisor's name." *Rita's Water Ice Franchise Corp. v. DBI Inv. Corp.*, 1996 WL 165518, at *4 (E.D. Pa. Apr. 8, 1996). Moreover, Courts have found that a violation of the restrictive covenant contained in the Franchise Agreement constitutes irreparable injury where, as here, the violation of the covenant affects the Plaintiff's legitimate business interests. *See, e.g.*, *Arch Personal Care Prods., L.P. v. Malmstrom*, 90 Fed.Appx. 17 (3d Cir. 2003) (affirming preliminary injunction enforcing a non-compete clause); *Soft Pretzel Franchise Sys., Inc. v. Taralli, Inc.*, 2013 WL 5525015, at *10 (E.D. Pa. Oct. 4, 2013) ("Irreparable injury results when a former franchisee competes against a franchisor in breach of a restrictive covenant contained in the parties' franchise agreement.") (internal citation and quotation marks omitted); *AAMCO Transmissions, Inc. v. Singh*, 2012 WL 4510928, at *4 (E.D. Pa. Oct. 1, 2012) (same); *InterMetro Indus. Corp. v. Kent*, 2007 WL 518345, at *5 (M.D. Pa. Feb. 12, 2007) ("[Franchisor] has also established that it is threatened with irreparable harm if [franchisee] is not enjoined from working at its competitor's business, as [franchisee's] knowledge of [franchisor's] business could harm its competitiveness."); *Prison Health Servs., Inc. v. Umar*, 2002 WL 32254510, at *20 (E.D. Pa. July 2, 2002) ("Under Pennsylvania law, a breach of a covenant not to the compete resulting in loss of goodwill and interference with customer relations can result in irreparable harm and thus be the basis for injunctive relief[.]"); *Hillard v. Medtronic, Inc.*, 910 F. Supp. 173, 179 (M.D. Pa. 1995) ("To the extent that the restrictive covenant is being violated, [franchisor] is suffering irreparable harm by the potential loss of customers posed by [franchisee's] activities.").

53. Defendants' conduct is undermining HLC's business, and it is likely that HLC will lose a substantial portion of its business within Robinson Township, Pennsylvania because of Defendants' failure to comply with their contractual obligations. It will be very difficult for HLC to win back lost clients, and the harm to HLC's goodwill and client relationships in the Exclusive Area will be irreparable. Damages for such loss would be an inadequate remedy, and as Defendants acknowledged in the Franchise Agreement, injunctive relief is, therefore, appropriate.

## COUNT I
## Breach of Contract - Covenant Not To Compete (Against Defendants)

54. HLC realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

55. The Franchise Agreement is a valid contract between the Plaintiff HLC and Defendants.

56. Under Section 17.3 of the Franchise Agreement, the Defendants agreed that they shall not, for a period of two years following termination or expiration of the Franchise Agreement, directly or indirectly (1) operate a business that is the same as, or similar to, Defendants' former Huntington Learning Center franchised business, (2) offer tutoring in reading, phonic, study skills, mathematics, or related areas, (3) offer courses or tutoring in one or more academic subjects, or (4) offer educational services or products the same as or similar to those offered in Defendants' former Huntington Learning Center franchised business within 25 miles from the Exclusive Area in Robinson Township, Pennsylvania or within 25 miles of any business that is owned by HLC or any of HLC's affiliates or franchises. Exhibit A, § 17.3.3.

57. Pursuant to the Confidentiality and Non-Competition Agreement appended to the Franchise Agreement, Kearns-Jones agreed "that while [she was] employed by [her] Employer and for a continuous uninterrupted period of two years beginning when [her] employment or

affiliation with [her] Employer ends, [she] shall not in any way . . . own, maintain, operate, engage in, be employed by, be a consultant to, loan money to, provide any assistance to, be a franchisee of, or have any interest in . . . any business in competition with the Franchisor."  Exhibit A.

58.     Despite their prior agreement to the contrary, Defendants failed to adhere to the covenants not to compete with HLC.  Defendants' failure to comply with the covenants not to compete constitutes a material breach of the Franchise Agreement.

59.     The restrictive covenants against competition contained in the Franchise Agreement are reasonably necessary to protect HLC's legitimate business interests, including, particularly, its confidential business information, its substantial relationships with specific prospective or existing customers and the goodwill associated with the Marks, the HLC System, and trade dress in the geographic area formerly served by Defendants while they were an authorized HLC franchisee.

60.     HLC has neither consented to Defendants' operation of, nor their association with, the Defendants' competing business, and has given Defendants no license or permissions to use the HLC System, or to keep the training materials or manuals.

61.     By reason of Defendants' breach of the Franchise Agreement, HLC has been seriously and irreparably harmed due to its loss of control over the HLC System and by the customer confusion resulting from the Defendants' actions.  Unless the Defendants are ordered to immediately comply with the non-compete obligations, HLC will continue to be so irreparably harmed.

62.     As a direct and proximate result of Defendants' breaches, HLC has suffered and will continue to suffer irreparable harm.

## COUNT II
### Breach of Contract - Post-Termination Obligations (Against Defendants)

63.     HLC realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

64.     The Franchise Agreement is a valid contract between the Plaintiff HLC and Defendants.

65.     Plaintiff, HLC, fully performed its obligations under the Franchise Agreement.

66.     The Franchise Agreement expired by its express terms on June 10, 2017.

67.     Despite their prior agreement to the contrary, the Defendants have failed to adhere to the post-termination obligations with HLC.

68.     Pursuant to the terms of the Guaranty, Kearns-Jones agreed, among other things, that she would personally comply with all of the post-termination obligations.

69.     In Section 16.1 of the Franchise Agreement, Defendants agreed that upon termination of the Franchise Agreement Defendants would return to HLC all customer lists, customer records, correspondence, and all materials relating to the operation of the franchised business.

70.     Notwithstanding the foregoing obligations and HLC's repeated demands, Defendants have wrongfully failed to return HLC confidential and proprietary manuals, client and customer lists, software or other forms and proprietary materials maintained by the Defendants and belonging to HLC.

71.     The Defendants' failure to comply with the post-termination obligations under the Franchise Agreement constitutes a material breach of the Franchise Agreement.

72.     As a direct and proximate result of Defendants' wrongful failure to comply with their contractual and post-termination obligations, HLC has been and continues to be injured in its business and property, and has and will continue to suffer irreparable injury.

## COUNT III
### Breach of Contract - Unpaid Fees (Against Defendants)

73.     HLC realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

74.     The Franchise Agreement is a valid contract between the Plaintiff HLC and Defendants.

75.     Pursuant to Section 6 of the Franchise Agreement, Defendants were obligated to remit royalty fees, training and technology fees, and other fees to HLC.

76.     Despite their obligation to do so, Defendants failed to remit certain of the fees due and owing under the Franchise Agreement.

77.     Defendants' failure to remit the agreed monies has damaged HLC with interest accruing daily until the balance is paid in full.

## COUNT IV
### Breach of the Guaranty (Against Kearns-Jones)

78.     HLC realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

79.     Pursuant to the terms of the Guaranty, Kearns-Jones agreed, among other things, that upon a default under the Franchise Agreement, she would immediately make each payment and perform each obligation required of Athena under the Franchise Agreement with HLC.

80.     Despite Kearns-Jones' obligations to do so, she has failed to make any payments or perform or cause Athena to perform each obligation required pursuant to the Franchise Agreement with HLC.

81.     Pursuant to the terms of the Guaranty, Kearns-Jones is liable to HLC for all of the outstanding amounts due and owing to HLC under the Franchise Agreement and for the fulfillment of the post-termination obligations provided in the Franchise Agreement.

### COUNT V
### Misappropriation of Trade Secrets - Defend Trade Secrets Act of 2016
### (Against Defendants)

82.     HLC realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

83.     The Defend Trade Secrets Act of 2016, passed by Congress in April 2016 and effective May 11, 2016, is an amendment to the Economic Espionage Act ("EEA") (18 U.S.C. § 1831 *et seq.*) that creates a federal private cause of action for trade secret misappropriation.  The Defend Trade Secrets Act of 2016 provides that "[a]n owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1), as amended by the DEFEND TRADE SECRETS ACT OF 2016, P.L. 114-153, May 11, 2016, 130 Stat. 376.  In addition, the Defend Trade Secrets Act of 2016 provides for injunctive relief in a civil action brought under 18 U.S.C. § 1836(b) "to prevent any actual or threatened misappropriation . . . on such terms as the court deems reasonable."  18 U.S.C. §§ 1836(b)(3)(A). Finally, the Defend Trade Secrets Act of 2016 provides that "[t]he district courts of the United States shall have original jurisdiction of civil actions brought under this section."  18 U.S.C. § 1836(c).

84.     HLC is the owner of various trade secrets, including confidential information, such as business processes, knowledge and technologies, and the right to use a unique business format and methods of operations relating to the establishment and operation of an academic tutoring services business. *See* Franchise Agreement, § 17.1. These trade secrets derive independent economic value from not being generally known to or not being reasonably ascertainable by proper means to the public and HLC's competitors, and HLC has taken measures to protect its trade secrets.  See 18 U.S.C. § 1839(3) (defining "trade secret").

85.     All of HLC's trade secrets, as identified above, relate to a product and/or service used in interstate or foreign commerce.  See 18 U.S.C. § 1836(b)(1).

86.     Defendants have misappropriated HLC's trade secrets by knowingly and improperly retaining HLC's confidential and proprietary manuals, client and customer lists, software or other forms and proprietary materials without legal right.

87.     Defendants' unauthorized possession and threatened use of HLC's trade secrets is causing HLC significant and irreparable harm, including the threatened loss of customers, technology, its competitive advantage, and goodwill in amounts which may be impossible to determine, unless Defendants are enjoined and restrained by order of this Court, as alleged above.

88.     HLC is entitled to injunctive relief under the federal Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(3)(A).

## COUNT VI
## Misappropriation of Trade Secrets - Pennsylvania Uniform Trade Secrets Act
## (Against Defendants)

89.     HLC realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

90.     Defendants are in possession of confidential and trade secret information as defined by the Pennsylvania Uniform Trade Secrets Act, 12 Pa. C. S. § 5301, *et seq.* The proprietary business and customer information of HLC constitutes trade secrets because HLC derives independent economic value from that information, such information is not generally known nor readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and because the information is the subject of reasonable efforts to maintain its secrecy. HLC's confidential and proprietary trade secret information described herein is not and was not generally known to HLC's competitors in the industry.

91.     Upon information and belief, Defendants threaten to misappropriate HLC's trade secrets without HLC's consent in violation of Pennsylvania Uniform Trade Secrets Act, 12 Pa. C. S. § 5301, *et seq.*

92.     Defendants operate a competing business at Open Minds Studio, approximately one mile from Defendants' former franchised business.

93.     As a product of Kearns-Jones' ownership and management of an HLC franchise, she had access to HLC's valuable trade secrets and confidential information. *See* Franchise Agreement, § 17.1. Kearns-Jones continues to have knowledge of that information, notwithstanding the fact that she is working for a competitor.

94.     Upon information and belief, Kearns-Jones has the intent to disclose HLC's trade secrets and confidential information to others, including her new business, in violation of Pennsylvania Uniform Trade Secrets Act, 12 Pa. C. S. § 5301, *et seq.*

95.     As a proximate result of Defendants' misappropriation and/or threatened misappropriation of HLC's trade secrets and confidential information, HLC has suffered, and will continue to suffer irreparable injury.

96.     Because HLC's remedy at law is inadequate, HLC seeks preliminary and permanent injunctive relief.  HLC is threatened with losing customers, technology, its competitive advantage, its trade secrets and goodwill in amounts which may be impossible to determine, unless Defendants are enjoined and restrained by order of this Court, as alleged above.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, HLC, requests the following relief against Defendants and all those in active concert or participation with them:

A.     Under the Franchise Agreement, an Order preliminarily and permanently enjoining the Defendants, for a period of two years, from directly or indirectly (1) operating a business that is the same as, or similar to, Defendants' former Huntington Learning Center franchised business, (2) offering tutoring in reading, phonic, study skills, mathematics, or related areas, (3) offering courses or tutoring in one or more academic subjects, or (4) offering educational services or products the same as or similar to those offered in Defendants' former Huntington Learning Center franchised business within 25 miles from the Exclusive Area or premises specified in the Franchise Agreement;

B.     Under the Franchise Agreement, an Order specifically enforcing all post-termination obligations;

C.     An Order requiring the Defendants to cooperate in the orderly transfer of HLC's confidential and proprietary manuals, client and customer lists, software or other forms and proprietary materials maintained by the Defendants and belonging to HLC;

D.     An Order, pursuant to 15 U.S.C. § 1116(a), requiring Defendants to file with the Court and to serve upon HLC's counsel within thirty (30) days after entry of any injunction or

order issued herein, a written report, under oath, setting forth in detail the manner in which they

have complied with the injunction or order;

E.      An award to HLC of its cost and expenses, including reasonable attorneys' fees

pursuant to Section 24.9 of the Franchise Agreement; and

F.      Such other and further relief as the Court deems just and proper.



Dated this 7th day of September, 2017.    By: */s/ Christopher L. Nickels*
                                          Christopher L. Nickels (PA 201419)
                                          QUARLES & BRADY LLP
                                          411 East Wisconsin Avenue, Suite 2400
                                          Milwaukee, WI 53202
                                          Tel:  (414) 277-5519
                                          Email:  Christopher.Nickels@quarles.com

                                          Scott A. McIntosh*
                                          Larissa E. Koshatka*
                                          QUARLES & BRADY LLP
                                          1701 Pennsylvania Avenue, Suite 700
                                          Washington, DC 20006
                                          Tel:  (202) 372-9516
                                          Email:  Scott.McIntosh@quarles.com
                                          Email:  Larissa.Koshatka@quarles.com

                                          Attorneys for Plaintiff
                                          Huntington Learning Centers, Inc.

                                          *Pro hac admission forthcoming*

QB\144818.00057\47928118.3