IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH

| | | |
|---|---|---|
| HUNTINGTON LEARNING CENTERS, INC., | ) ) | |
| | ) | 2:17-CV-01174-CRE |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| BARBARA KEARNS-JONES, AND; ATHENA EDUCATES, LLC, | ) ) ) | |
| Defendants, | ) ) | |

## REPORT AND RECOMMENDATION

Cynthia Reed Eddy, United States Magistrate Judge.

### I.  RECOMMENDATION

Presently before the Court is Plaintiff Huntington Learning Centers, Inc.'s ("Plaintiff" or "HLC") motion for preliminary and permanent injunction [ECF Nos. 6 and 31] against Defendants Barbara Kearns-Jones and Athena Educates, LLC ("Defendants").  A hearing was held on the matter on October 25, 2017.  For the reasons that follow, it is respectfully recommended that Plaintiff's motion for preliminary and permanent injunction be granted.

### II.  REPORT

#### a.  Findings of Fact

##### i.  Procedural Background

1.    HLC filed its complaint seeking preliminary and permanent injunctive relief, damages and attorneys' fees and costs on September 7, 2017. [ECF No. 1]; Tr. 3:18-4:5.

2.    HLC personally served a copy of the complaint on Defendant Kearns-Jones by process server on September 11, 2017.  *See* Affidavit of Service [ECF No. 3].

3.    HLC personally served a copy of the complaint on Defendant Athena by process server on

September 16, 2017. See Affidavit of Service [ECF No. 4].

4.       HLC filed a motion for preliminary injunction, along with a brief in support thereof and supporting declaration and exhibits. [ECF Nos. 6-10].

5.       The magistrate judge scheduled a status conference for September 25, 2017 and ordered HLC serve Defendants with a copy of the scheduling order, to which HLC complied. *See* [ECF No. 19].

6.       Defendants did not attend the status conference. *See* [ECF No. 21].

7.       The magistrate judge entered an order on September 25, 2017, scheduling a preliminary injunction hearing, setting forth certain deadlines for various pre-hearing matters, and ordering HLC to serve Defendants with a copy of the Order. *See* [ECF No. 22 at 2].

8.       HLC filed a certificate of service for these documents on September 26, 2017. *See* [ECF No. 23].

9.       Defendants failed to file any response to HLC's motion for preliminary injunction, and they have not complied with any other deadlines as set forth in the court's September 25, 2017 order. Tr. 4:24-25; 5:1-6.

10.      HLC complied with the court's order by submitting a witness list, marking and exchanging exhibits and by submitting proposed findings of fact and conclusions of law. Tr. 5:7-11.

11.      On October 13, 2017, HLC filed a motion for entry of default, and the Clerk entered default on October 16, 2017. *See* [ECF Nos. 28, 30].

12.      On October 18, 2017, HLC moved for default judgment and to convert the preliminary injunction hearing scheduled for October 25, 2017 into a hearing for permanent injunctive relief and to resolve all claims asserted in the complaint. *See* [ECF No. 31].

13.      On October 19, 2017, the court granted HLC's request and ordered that it serve a copy of the court's order and the docket sheet on Defendants by overnight certified mail. *See* [ECF No. 33].

14.     Defendants did not appear for the hearing for preliminary and permanent injunctive relief and for default judgment.  Tr. 7:23-25.

ii.  Factual Background

**The Parties**

15.     Plaintiff Huntington Learning Centers, Inc. ("HLC") is a corporation organized and existing under the laws of Delaware, with its principal place of business at 496 Kinderkamack Road, Oradell, New Jersey 07649. [ECF No. 1, ¶ 1].

16.     Defendant Athena Educates, LLC ("Athena") is a Pennsylvania limited liability company, organized and existing under the laws of the State of Pennsylvania, with its principal place of business located at 108 Hazel Street, Bentleyville, Pennsylvania 15314. *Id*. at  ¶ 2.

17.     Defendant Barbara Kearns-Jones ("Kearns-Jones") is an individual and an adult citizen of the State of Pennsylvania, residing at 108 Hazel Street, Bentleyville, Pennsylvania 15314. *Id*. at ¶ 3.

18.     Kearns-Jones is the sole owner and member of Athena. *Id.* at ¶ 3.

**The Huntington Learning Center System**

19.     Since 1977, HLC has engaged in the business of operating, and franchising others to operate, academic tutoring centers throughout the United States. [ECF No. 8, ¶ 4]; Tr. 2:12-13.

20.     Among the franchise systems offering academic tutoring, HLC was the first to establish its tutoring program, and it has grown to more than 250 franchised centers nationwide. [ECF No. 8, ¶ 5].

21.     The core of HLC's business is its franchise system. *Id.* at ¶ 6.

22.     Through its franchisees, HLC develops and maintains relationships with its students. *Id*. at ¶ 7.

23.     The franchisees provide services to customers that include test preparation, homework

assistance, and other academic coaching. *Id*. at ¶ 8.

24.    HLC's franchisees operate pursuant to written franchise agreements, but only in such manner and at such locations as are expressly authorized. *Id*. at ¶ 9.

25.    The franchise agreements also license to the franchisees a distinct, uniform system (the "HLC System") consisting of confidential information, such as business processes, knowledge and technologies, and the right to use a proprietary business format and methods of operations relating to the establishment and operation of an academic tutoring services business. *Id*. at ¶ 10.

26.    HLC takes significant efforts to protect its goodwill, name and reputation, trade secrets, and other confidential and proprietary information. *Id*. at ¶ 11.

27.    As such, all HLC franchise contracts require franchisees to comply with the HLC System in the operation of their HLC academic tutoring businesses. *Id*. at ¶ 19.

28.    HLC has invested substantial effort over a period of 40 years, including the expenditure of millions of dollars, advertising and promoting HLC academic tutoring businesses and the products and services that they offer under the HLC name throughout the United States. *Id*. at ¶ 20.

29.    As a result of such effort, the products and services offered by HLC academic tutoring businesses have met with widespread public approval and established demand and goodwill among consumers throughout the United States. *Id*. at ¶ 21.

30.    The value of the goodwill associated with the HLC System cannot be precisely quantified, but because HLC is one of only a few national academic tutoring franchise systems in the United States and is widely known as a provider of such services, the value of HLC's goodwill exceeds millions of dollars. *Id*. at ¶ 22.

### The Terms of the Franchise Agreement and Guarantee

31.    On or about July 2, 2014, Defendants acquired an existing HLC franchise that had been

operated in Robinson Township, Pennsylvania since 1997. *Id*. at ¶ 23; Tr. 2:13-15.

32.    In connection with the acquisition, Defendants entered into a written franchise agreement (the "Franchise Agreement") with HLC whereby HLC granted Defendants the exclusive right to operate a HLC franchise in a defined area consisting of Robinson Township, Pennsylvania ("Exclusive Area"). [ECF No. 8, ¶ 24, Exh. A]; Tr. 2:13-15.

33.    By written guarantee signed and delivered with the Franchise Agreement, Kearns-Jones guaranteed the payment and performance obligations of the franchisee. A copy of this written guarantee ("Guarantee") is appended to the Franchise Agreement. [ECF No. 8, Exh. A].

34.    The Franchise Agreement contained a three-year term and provided terms for unlimited renewals. *Id*., Exh. A, § 3.1.

35.    Under Section 17.3 of the Franchise Agreement, Defendants agreed that they shall not, for a period of two years following expiration or termination, within 25 miles from the Exclusive Area or within 25 miles of any business that is owned by HLC or any of its franchisees, directly or indirectly (1) operate a business that is the same as, or similar to, Defendants' former Huntington Learning Center franchised business, (2) offer tutoring in reading, phonics, study skills, mathematics, or related areas, (3) offer courses or tutoring in one or more academic subjects, or (4) offer educational services or products the same as or similar to those offered in Defendants' former Huntington Learning Center franchised business. *Id*., Exh. A, § 17.3.3; Tr. 2:18-24.

36.    Kearns-Jones also signed a Confidentiality and Non-Competition Agreement (the "Non-Competition Agreement") in her role as owner of Athena, whereby she agreed "that while [she] was] employed by [her] Employer [the franchisee] and for a continuous uninterrupted period of two years beginning when [her] employment or affiliation with [her] Employer ends, [she] shall not in any way . . . own, maintain, operate, engage in, be employed by, be a consultant to, loan money to, provide any assistance to, be a franchisee of, or have any interest in . . . any business in

competition with the Franchisor." [ECF No. 8, Exh A]; Tr. 2:18-24.

37.     Pursuant to Section 17.1 of the Franchise Agreement, Defendants expressly acknowledged that the non-competition provisions were reasonable, "notwithstanding the presence or absence of any franchised businesses in the area, market, or state within which your Franchised Business is located." [ECF No. 8, Exh A].

38.     There are three existing HLC centers within 25 miles of both Defendants' former location and their new location. [ECF No. 8, ¶ 49].

39.     Defendants also acknowledged in Section 17.1 that they would receive certain valuable information about HLC services, including development and operation of the HLC System, and that they would not have been given the information without their execution of the Franchise Agreement. *Id*., Exh A.

40.     Defendants acknowledged that the information has been developed by HLC over a number of years at great effort and expense and includes marketing techniques, operational procedures, business practices, and management methods not generally known, which will be of significant competitive advantage to Defendants, and all of which are trade secrets. *Id*.

41.     Defendants further acknowledged that they "had limited or no experience in the business franchised hereunder and that such experience, if any, was not comparable to that provided under the [HLC] System; and it would take considerable time and effort for [Defendants] to develop knowledge and experience in the business franchised hereunder comparable to that provided under the [HLC] System." *Id*.

42.     Defendants agreed that they would return to HLC all customer lists, customer records, correspondence, and all materials relating to the operation of the franchised business following termination of the Franchise Agreement. *Id*., Exh. A, § 16.1.; Tr. 6:22-7:11.

43.     Pursuant to Section 16.1.5 of the Franchise Agreement, Defendants also agreed that failure to return HLC's manual, any of HLC's trade secrets, operating instructions, business practices, or any other proprietary information "will cause irreparable injury [to HLC], and [HLC] shall have the right to injunctive relief requiring [Defendants] to comply with the requirements of this Paragraph 16.1.5, in addition to any other remedies [HLC] may have under [the Franchise Agreement], at law or in equity[.]" [ECF No. 8, Exh. A, § 16.1.]; Tr. 6:22-7:11.

44.     Similarly, in the Non-Competition Agreement, Kearns-Jones expressly acknowledged that a violation of such agreement will cause HLC irreparable harm, and therefore, HLC may apply for the issuance of an injunction preventing such violation, in addition to any other remedies. [ECF No. 8, Exh A].

45.     In Section 6.5 of the Franchise Agreement, the Defendants agreed, among other things, to pay HLC a monthly royalty equal to 8% of the preceding month's Gross Revenue from their franchise business in exchange for the continuing right to use the System and the Marks. Exh. O, *admitted at hearing on* October 25, 2017; Tr. 10:14-23.  In addition to the royalty, the Defendants agreed to pay HLC a training and technology fee of $550 per month after the second full calendar year of the Franchised Business operation. [ECF No. 8, Exh. A]; Tr. 3:4-7.  Pursuant to Section 6.5.2, Defendants were required to pay a minimum continuing royalty of $2,000 per month. Tr. 11:15-23; Tr. 12:14-17.

46.     In Section 6.15 of the Franchise Agreement, the Defendants agreed, among other things, that if any payment due to HLC is not paid when due, then such payment shall be subject to the then-current late fee and shall bear daily interest payable immediately upon demand at the rate of 18% per annum, but no more than the highest rate permitted by applicable law. [ECF No. 1, ¶ 24]; [ECF No. 8, Exh. A].

47.     Pursuant to Section 24.9 of the Franchise Agreement, the prevailing party in any judicial action involving HLC and Defendants shall be entitled to recover its out-of-pocket costs and expenses, including all court costs and attorneys' fees, costs, and expenses. [ECF No. 1, ¶ 27]; [ECF No. 8, Exh. A].

### The Expiration of the Franchise Agreement and Defendants' Post-Termination Violations of the Parties' Agreements

48.     On June 20, 2017, HLC, by counsel, sent a notice of expiration of the Franchise Agreement to Defendants via overnight delivery service (the "Termination Letter"). [ECF No. 8, ¶ 31, Exh. B.]; Tr. 3:12-14.

49.     As set forth in the Termination Letter, Defendants were reminded of their post-termination obligations and HLC demanded, among other things, the immediate return of HLC's intellectual property and other proprietary materials belonging to HLC. [ECF No. 8, ¶ 32, Exh. B]; Tr. 3:14-17. Excluding attorneys' fees and litigation expenses, Defendants owed HLC $9,719.05 in past due amounts. Tr. 11:9-23; Tr. 12:18-13:7.

50.     Unbeknownst to HLC, Defendants established and supported a competing business providing academic tutoring services to students prior to the end of the term of the Franchise Agreement. [ECF No. 8, ¶ 33; Tr. 3:8-11.

51.     That business was not authorized by HLC. [ECF No. 8, ¶ 35].

52.     The business was opened and operated at 5992 Steubenville Pike, Pittsburgh, Pennsylvania, approximately one mile from the location where Defendants operated their HLC franchise, at 6563 Steubenville Pike. *Id.*, at ¶ 36; Tr. 3:8-11.

53.     Defendants called their competing business "Open Minds Studios." [ECF No. 8 ¶ 34]; Tr. 3:11.

54.     The Open Minds Studios website states that they provide the following services: reading,

writing, and math skills; study and test taking skills; subject tutoring; ACT and SAT prep; and summer courses. [ECF No. 8, ¶ 37 and Exh. C].

55.     In light of Defendants' representations in Section 17.1 of the Franchise Agreement that they "had limited or no experience in the business franchised hereunder and that such experience, if any, was not comparable to that provided under the [HLC] System; and [that] it would take considerable time and effort for [Defendants] to develop knowledge and experience in the business franchised hereunder comparable to that provided under the [HLC] System," Defendants must have necessarily used the HLC System as the model for the "Open Minds Studios." *Id.*, Exh. A.

56.     On June 29, 2017, James Emmerson, HLC's Chief Financial Officer, visited Open Minds Studios and spoke with Kearns-Jones. [ECF No. 8, ¶ 38].

57.     Emmerson advised Kearns-Jones that the Franchise Agreement had expired and that she was not authorized to continue operating an academic tutoring business in violation of the Franchise Agreement. *Id.* at ¶ 39.

58.     Emmerson observed that Kearns-Jones appeared to have relocated the furnishings and all of the trade secret and confidential materials and information from her franchise to the Open Minds Studios location. *Id.* at ¶ 40.

59.     While Kearns-Jones initially explained that she relocated because her lease for 6563 Steubenville Pike, Pittsburgh, Pennsylvania expired at the beginning of June 2017 and that she relocated temporarily to "teach out" the students from her center, she also stated that a friend would be operating a business at the new location. *Id.* at ¶ 41.

60.     Mr. Emmerson advised Kearns-Jones that the Franchise Agreement had already expired, that she was not authorized to continue operating, and that she would need to close. *Id.* ¶ 42.

61.     Mr. Emmerson also advised Kearns-Jones that HLC would need to pursue legal action if she refused to comply with her obligations, to which she responded "Bring it on." *Id.* at ¶ 43.

62.     On June 30, 2017, HLC, by counsel, sent a cease-and-desist letter to Defendants via overnight delivery service (the "Cease-and-Desist Letter"). [ECF No. 8, ¶ 44, Exh. D].

63.     As set forth in the Cease-and-Desist Letter, Defendants were reminded of their post-termination obligations and HLC demanded, among other things, the discontinuation of Defendants' operation of a competing business within a radius of 25 miles from the former Exclusive Area and other HLC franchised business. *Id*.

64.     After receiving no response to the Cease-and-Desist Letter, HLC's counsel retained a private investigator to determine whether Kearns-Jones had transferred the new location to a friend, as she told Mr. Emmerson on June 29, 2017, or whether she owned and/or remained involved at Open Minds Studios. [ECF No. 8, ¶ 45; ECF No. 9, ¶ 1].

65.     On both July 25, 2017 and July 27, 2017, the private investigator observed Kearns-Jones departing her residence around 9:00 a.m. and arriving at Open Minds Studios, 5992 Steubenville Pike, Suite 103, Pittsburgh, Pennsylvania, around 9:45 a.m. [ECF No. 9, ¶¶ 6, 8].

66.     On both dates, the private investigator observed Kearns-Jones entering the building where Open Minds Studios is located. *Id*. at ¶¶ 7, 9.

67.     On August 8, 2017, two private investigators acting in an undercover capacity, entered Open Minds Studios at approximately 10:05 a.m. *Id*. at ¶ 10.

68.     Kearns-Jones conversed with one of the private investigators and identified herself as "Barbara." *Id*. at ¶ 11.

69.     The private investigator stated that she was looking for information to potentially enroll her niece. *Id*.

70.     Kearns-Jones identified herself as the manager and owner of Open Minds Studios. *Id*.

71.     Kearns-Jones wrote down information relating to Open Minds Studios' services and fees on a small white paper with Open Minds Studios insignia on it. *Id*.

72.     She also wrote her name as "Barb Kearns" on an Open Minds Studios business card and provided both the business card and the piece of paper to the private investigator. *Id*. at ¶ 11 and Exh. 5.

73.     Despite receiving notice of the termination of the Franchise Agreement on or about June 21, 2017 and the Cease-and-Desist Letter on or about July 1, 2017, and HLC's reminder of their post-termination obligations, Defendants continue to provide services to customers that include test preparation, homework assistance, and other academic coaching approximately one mile from the location where Defendants operated their HLC franchise. [ECF No. 1, ¶ 35.]; Tr. 3:12-17.

74.     Indeed, service upon Athena was completed through service upon Kearns-Jones at Open Minds Studios. [ECF No. 4].

75.     Accordingly, Defendants have not complied with their post-termination non-competition obligations and have not satisfied the other post-termination obligations contained in the Franchise Agreement. [ECF No. 8, ¶ 48].

76.     In particular, Defendants have refused to cooperate in the orderly transfer of HLC's customers to HLC for continued servicing. *Id*. at ¶ 47.

77.     In addition, despite multiple requests, Defendants have not turned over any of the trade secrets, confidential and proprietary manuals, client and customer lists, software or other forms and proprietary materials retained by Defendants and belonging to HLC. *Id*. at ¶ 46.

78.     Defendants have failed and refused to cease using the HLC System. [ECF No. 1, ¶ 40].

79.     Defendants have failed and refused to pay all sums owing to HLC under the Franchise Agreement including royalties, technology and training fees, late fees, interest, attorneys' fees, and costs. *Id*. at ¶ 41.

**HLC's Other Nearby Centers and Impact on HLC's Ability to Retain or Transfer Students**

80.     Section 17.3 prohibits Defendants from operating a competing business within 25 miles of any other HLC franchised business for two years following termination or expiration of the Franchise Agreement. There are three other HLC franchised centers less than 25 miles from Defendants' new competing location. [ECF No. 8, ¶ 49].

81.     One authorized HLC franchised center, located at 2848 Washington Road, McMurray, Pennsylvania 15317, is approximately 14.5 miles from Defendants' new competing location. *Id*. at ¶ 50.

82.     A second authorized HLC franchised center, located at 4721 McKnight Road, Pittsburgh, Pennsylvania 15237, is approximately 16.2 miles from Defendants' new competing location. *Id*. at ¶ 51.

83.     The third authorized HLC franchised center, located at 20636 B. Route 19, Cranberry Township, Pennsylvania 16066, is approximately 21.7 miles from Defendants' new competing location. *Id*. at ¶ 52.

**HLC's Desired Relief**

84.     HLC seeks a preliminary and permanent injunction that enjoins Defendants and their agents for a period of two years from directly or indirectly owning, maintaining, advising, investing in, operating, engaging in, being employed by, being a consultant to, loaning money to, providing any assistance to, being a franchisee of, or having any interest in a business at 6563 Steubenville Pike, Pittsburgh, Pennsylvania, within Robinson Township, Pennsylvania, or within 25 miles from 6563 Steubenville Pike, Pittsburgh, Pennsylvania, or any business owned by Plaintiff or any of its franchisees: (a) that is the same as or similar to Defendants' former Huntington Learning Center franchised business; (b) that offers tutoring in reading, phonics, study skills, mathematics or related areas; (c) that offers courses or tutoring to prepare for standardized entrance exams, including the SAT and ACT; (d) that offers courses or tutoring in any academic subject; and (e) that offers educational

services or products the same as or similar to those offered in Defendants' former Huntington Learning Center franchised business. Tr. 5:24-6:20.

85.     HLC also seeks the return of: (a) the manual setting forth HLC's business system, and all of HLC's mandatory standards, specifications, policies and procedures; (b) all paper, electronic, and other copies, summaries, and extracts from the manual referenced in the preceding sentence; (c) all other materials containing any of HLC's trade secrets, operating instructions and business practices relating to the operation of the businesses franchised by HLC, and any paper, electronic, and other copies and summaries thereof; (d) all lists of present and former customers of Defendants' former franchised location, whether in print or electronic form; and (e) all software licensed from HLC. Tr. 6:21-7:11.

86.     HLC also seeks that default judgment be entered against Defendants due to their failure to respond. Tr. 7:12-13.

87.     In addition to the injunctive relief sought, HLC seeks an award of $9,719.05, plus its attorneys' fees and expenses. Tr. 15:2-7.

### b.   Conclusions of Law

### Jurisdiction and Venue

1.     The Court has personal jurisdiction over both Defendants, Athena and Kearns-Jones, because they are residents of Pennsylvania.

2.     The Court has federal subject matter jurisdiction over Count V, which is a claim under the Federal Defend Trade Secrets Act of 2016, 18 U.S.C. §§ 1831 *et seq*. 28 U.S.C. § 1331.

3.     The Court has supplemental jurisdiction over Counts I through IV and VI because they form part of the same case or controversy as Count V. 28 U.S.C. § 1367.

4.     The value of the injunctive relief sought by Plaintiff exceeds $75,000, exclusive of interest and costs. *Barbuto v. Med. Shoppe Int'l, Inc.*, 166 F. Supp. 2d 341, 344 (W.D. Pa. 2001) (amount in controversy where an injunction is sought is the value to the plaintiff of operating free from the

activities sought to be enjoined); *Soft Pretzel Franchise Sys. Inc. v. Taralli, Inc.*, No. CIV.A. 13-3790, 2013 WL 4774086, at *4 (E.D. Pa. Sept. 6, 2013).

5.      The Court has diversity jurisdiction over the claims asserted in this case because the Plaintiff has diverse citizenship from all of the Defendants and because the value of the amount in controversy exceeds $75,000. 28 U.S.C. § 1332.

6.      Venue is proper in this District because Defendants operate the business that is the subject of this action in Allegheny County, Pennsylvania. Additionally, a substantial part of the events giving rise to this action occurred in Allegheny County, Pennsylvania. 28 U.S.C. § 1391.

### Standards for Preliminary Injunction

7.      Based upon Defendants' default and HLC's motion for default judgment, all well-pleaded facts alleged in the complaint are to be taken as true, and HLC is entitled to a judgment in its favor on the merits of the claims asserted in the complaint. *Thiem v. Sigler*, 651 F. Supp. 460, n. 3 (W.D. Pa. 1985).

8.      When the merits are established, the tests for a preliminary injunction and a permanent injunction are effectively the same. *Evony, LLC v. Holland*, No. 2:11-cv-00064, 2011 WL 1230405, at *7 (W.D. Pa. March 31, 2011).

9.      The failure of defendants to respond to a motion for preliminary injunction or appear at the preliminary injunction hearing "constitutes acquiescence to the terms of the proposed preliminary injunction." *GNC Franchising, LLC v. Farid*, No. 05-1741, 2006 WL 952053, at *1 (W.D. Pa. Apr. 11, 2006) (granting preliminary injunction where the defendant failed to respond to plaintiff's motion for preliminary injunction or appear at the subsequent hearing).  While Defendants have failed to respond to Plaintiff's motion for preliminary injunction or appear at the hearing and this failure to respond or appear constitutes acquiescence to the terms of the proposed preliminary

injection, the court will still analyze Plaintiff's motion under the applicable legal standard.

10.     In this Circuit, a party seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) the public interest favors such relief. *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004); *see also S&R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 374 (3d Cir. 1992).

## Noncompete Provisions (Counts I and IV)

11.     HLC has succeeded on the merits of the breach of the covenant against competition claims based upon Defendants' defaults. *Thiem*, 651 F.Supp. at 463, n. 3; *Evony, LLC*, 2011 WL 1230405, at *2.

12.     Additionally, Section 17.3 of the Franchise Agreement sets forth a post-termination covenant against competition, and Defendants have likely breached that provision by operating a competing business approximately one mile from their former location.

13.     A non-compete covenant is enforceable if: (1) it relates to either a contract for the sale of goodwill or other subject property; (2) it is supported by adequate consideration; and (3) the application of the covenant is reasonably limited in both time and territory. *Tantopia Franchising Co., LLC v. W. Coast Tans of PA, LLC*, 918 F. Supp. 2d 407, 414–15 (E.D. Pa. 2013)

14.     A non-compete clause in a franchise agreement relates to the sale of goodwill. *AAMCO Transmissions, Inc. v. Singh*, No. CIV.A. 12-2209, 2012 WL 4510928, at *3 (E.D. Pa. Oct. 1, 2012), *motion for recon. denied*, 2012 WL 5829782 (E.D. Pa. Nov. 16, 2012)

15.     The non-compete covenant is reasonably limited in time and territory because the non-compete clause lasts for two years and applies only to academic tutoring services businesses. *See AAMCO Transmissions, Inc.*, 2012 WL 4510928, at *2 (finding two-year non-compete covenant reasonable).

16. Thus, this factor weighs in favor of HLC.

**Defendants' Post-Termination Obligations and Associated Claim under the Guarantee Provision (Counts II and IV)**

17. HLC has succeeded on the merits of the breach of the post-termination obligations claim under the Franchise Agreement based upon Defendants' defaults. *Thiem*, 651 F.Supp. at 463, n. 3; *Evony, LLC*, 2011 WL 1230405, at *2.

18. Additionally, the Franchise Agreement was a binding agreement, which set forth obligations that the Defendants were required to comply with following expiration or termination of the agreement, and Defendants have likely breached the Franchise Agreement by failing to take the required actions. *Soft Pretzel Franchise Sys., Inc.*, 2013 WL 5525015, at *9; *MarbleLife, Inc. v. Stone Res., Inc.*, 759 F. Supp. 2d 552, 555 (E.D. Pa. 2010).

19. Thus, this favor weighs in favor of HLC.

**Misappropriation of Trade Secrets (Counts V and VI)**

20. HLC has succeeded on the merits of its misappropriation of trade secrets claims against Defendants. *Thiem*, 651 F.Supp. at 463, n. 3; *Evony, LLC*, 2011 WL 1230405, at *2.

21. Defendants are in possession of HLC's trade secrets as defined under both DTSA and PUTSA. 18 U.S.C. § 1839(3); 12 Pa. C. S. § 5302.

22. HLC has taken reasonable measures to keep such information secret. 18 U.S.C. § 1839(3)(A); 12 Pa. C. S. § 5302.

23. HLC's trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. 18 U.S.C. § 1839(3)(B); 12 Pa. C. S. § 5302.

24. It is therefore likely that Defendants have misappropriated HLC's trade secrets under both

DTSA and PUTSA. 18 U.S.C. § 1839(5)(B)(ii)(II); 12 Pa. C. S. § 5302.

25.     Thus, this factor weighs in favor of HLC.

**Irreparable Harm – Alleged Violations of Post-Termination Non-Competition Obligations**

26.     "Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of good will." *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998).

27.     A franchisor has a "protectable interest in the sale of a franchise because of expenditures made by a franchisor for market development and training, the grant of an exclusive sales area, and permission to use the franchisor's name." *Rita's Water Ice Franchise Corp.*, 1996 WL 165518, at *4.

28.     A violation of the restrictive covenant contained in a franchise agreement constitutes irreparable injury where, as here, the violation of the covenant affects the plaintiff's legitimate business interests. *See, e.g., Arch Personal Care Prods., L.P. v. Malmstrom*, 90 Fed.Appx. 17 (3d Cir. 2003) (affirming preliminary injunction enforcing a non-compete clause)

29.     As such, the harm to HLC's goodwill and client relationships arising from Defendants' conduct in allegedly violating the non-compete obligations constitutes irreparable injury.

30.     Thus, this factor weighs in favor of HLC.

**Irreparable Harm from Refusal to Return and Misappropriation of Trade Secrets and Confidential and Proprietary Information**

31.     Defendants' retention of the HLC client files has provided Defendants with an unfair opportunity to identify, solicit, and service HLC customers. HLC's business is likely being irreparably injured, and will continue to be irreparably injured, by Defendants' activities in their former franchised area in violation of HLC's contractual rights. *See ServiceMaster Residential/Commercial Servs. L.P. v. Westchester Cleaning Servs., Inc.*, No. 01-CIV-2229, 2001 WL 396520, *3 (S.D.N.Y. Apr. 19, 2001) ("There is a recognized danger that former franchisees

will use the knowledge that they have gained from the franchisor to serve its former customers, and that continued operation under a different name may confuse customers and thereby damage the goodwill of the franchisor.").

32.     Defendants' express contractual consent to the injunctive remedies sought, and their express recognition of the irreparable harm suffered by HLC by virtue of their wrongful competition, failure to return HLC trade secrets and proprietary and confidential client files, mandates preliminary injunctive relief. *JSE Bus. Dev. Group*, 2009 WL 5205983, at *3 ("irreparable harm...was expressly recognized by both parties in agreeing to the terms of the Franchise Agreement.").

33.     Defendants' failure and refusal to return HLC's trade secrets and proprietary and confidential information, including client files, is likely causing HLC irreparable injury because when "a party is in possession of another party's confidential information and is poised to use or disclose such information, there is a likelihood of irreparable harm." *JSE Bus. Dev. Group*, 2009 WL 5205983, *3 (citing *Nat'l Starch & Chem. Co. v. Parker*, 219 N.J. Super. 158, 162 (App. Div. 1987).

34.     Thus, this factor weighs in favor of HLC.

### Balance of Harms

35.     "[T]he injury a defendant might suffer if an injunction were imposed may be discounted by the fact that the defendant brought that injury upon itself." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir.2002); *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995) (holding that self-inflicted harm cannot be deemed "irreparable").

36.     While the Defendants may suffer harm by not being able to continue operating Open Minds

Studio, this harm is outweighed by the fact that Defendants brought this injury upon themselves by flouting the terms they expressly agreed to in the Franchise Agreement and the Guarantee. Thus, this factor weighs in HLC's favor.

**The Public Interest**

37.     "As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." *AT&T v. Winback & Conserve Program*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994).

38.     HLC has demonstrated both a likelihood of success on the merits of its claims and that irreparable injury would result if the injunctive relief is not granted, therefore this factor weighs in favor of HLC.

c.     <u>Conclusion</u>

Accordingly, because Plaintiff has met all of the factors for the issuance of a preliminary and permanent injunction, it is respectfully recommended that the following Order be entered:

IT IS HEREBY ORDERED that after considering all facts and arguments presented to the court upon due notice to all parties and the Court having reviewed Plaintiff's Motion for Preliminary and Permanent Injunctive Relief [ECF Nos. 6, 31], Plaintiff's motion is GRANTED as follows:

(1)     Defendants and their agents, servants, employees, representatives, and/or affiliates, and all those who act in concert or participation with them are hereby enjoined, for a period of two years from the date of this Order, from directly or indirectly, owning, maintaining, advising, investing in, operating, engaging in, being employed by, being a consultant to, loaning money to, providing any assistance to, being a franchisee of, or having any interest in a business at 6563 Steubenville Pike, Pittsburgh, Pennsylvania; within Robinson Township, Pennsylvania; or within

25 miles from 6563 Steubenville Pike, Pittsburgh, Pennsylvania, Robinson Township, Pennsylvania, or any business owned by Plaintiff or any of its franchisees:

       a.      that is the same as, or similar to, Defendants' former Huntington Learning Center franchised business;

       b.      that offers tutoring in reading, phonics, study skills, mathematics, or related areas;

       c.      that offers courses or tutoring to prepare for standardized entrance exams, including the SAT and ACT;

       d.      that offers courses or tutoring in any academic subject; and

       e.      that offers educational services or products the same as or similar to those offered in Defendants' former Huntington Learning Center franchised business; and

(2).      Defendants shall, within ten (10) days of the date of this Order, return to Plaintiff:

       a. the manual setting forth Plaintiff's business system, and all of Plaintiff's mandatory standards, specifications, policies, and procedures;

       b.      all paper, electronic, and other copies, summaries, and extracts from the manual referenced in the preceding sentence;

       c.      all other material containing any of Plaintiff's trade secrets, operating instructions, and business practices relating to the operation of the businesses franchised by Plaintiff (and any paper, electronic, or other copies and summaries thereof);

       d.      all lists of present and former customers of Defendants' former franchise location, whether in print or electronic form; and

       e.     all software licensed from Plaintiff.

IT IS FURTHER ORDERED that Defendants shall file with the court and serve upon Plaintiff's counsel within thirty (30) days after the entry of any injunction or order issued herein, a written report, under oath, setting forth in detail the manner in which they have complied with such injunction or order.

## III.    CONCLUSION

Therefore, pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), Federal Rule of Civil Procedure 72, and the Local Rules for Magistrates, the parties have until **November 21, 2017** to file objections to this report and recommendation. Unless Ordered otherwise by the District Judge, responses to objections are due **December 5, 2017.** Failure to file timely objections may constitute a waiver of any appellate rights. *Brightwell v. Lehman*, 637 F.3d 187, 193 n. 7 (3d Cir. 2011).

Plaintiffs shall serve a copy of this Report and Recommendation upon Defendants at their last known addresses via regular first class mail and provide a certificate of service thereafter.


Dated: November 7, 2017                         Respectfully submitted,
                                        s/ Cynthia Reed Eddy
                                        Cynthia Reed Eddy
                                        United States Magistrate Judge


cc:    Honorable David S. Cercone
       United States District Judge
       *via electronic filing*

       all counsel of record *via CM/ECF electronic filing*